## Sudarkasa v. Glanton

474

*Carl Singley,* for plaintiff.

*Richard L. Bazelon,* for defendant Reed, Smith, Shaw and McClay LLP.

*Robert J. Sugarman,* for defendant Glanton.

ABRAMSON, *J.,* June 30, 2002—

## I. FACTS AND PROCEDURAL HISTORY

Plaintiff-appellant, Dr. Sudarkasa, brought this action for defamation, civil conspiracy, breach of duty of confidentiality and loyalty, intentional infliction of emotional distress, and tortious interference with a contract. The case proceeded to trial on July 9, 2001. On July 31, 2001, the court granted a nonsuit as to all counts. Dr. Sudarkasa subsequently filed a motion for post-trial relief, which the court denied. That denial is the subject of this appeal.

This case arises from the resignation of Dr. Sudarkasa from her position as president of Lincoln University on September 15, 1998, six days after the office of the Auditor General of Pennsylvania issued a report based upon a nine-month investigation finding irregularities in Lin-

coln spending.[1] Dr. Sudarkasa alleged that she was forced to resign from her position as president of Lincoln by reason of Lincoln's general counsel, defendant Richard Glanton's defamatory statements, conspiracy with Pennsylvania senators Vince Fumo and Hardy Williams, tortious interference with her employment contract with Lincoln, and breach of duty of loyalty and confidentiality. At all material times, Glanton was a partner with the law firm of defendant, Reed, Smith, Shaw & McClay. Dr. Sudarkasa's claims against Reed Smith were for vicarious liability of its employee, Glanton.

Dr. Sudarkasa claimed that Glanton conspired with Pennsylvania senators Vincent Fumo and Hardy Williams to have the senators enter into an investigation of the affairs of Lincoln under their authority as members of the Senate Appropriations Committee for the purpose of removing her as president of Lincoln. About nine months before Dr. Sudarkasa's resignation, and the issuance of the Auditor General's report,[2] the Pennsylvania Senate Appropriations Committee began an investigation into Lincoln's spending. On April 20, 1998, the Senate Appropriations Committee voted to withhold half of the usual $11 million annual funding.[3] The withholding of

1. Lincoln receives approximately one-third of its $11 million funding annually from the Commonwealth of Pennsylvania, appropriated by the General Assembly to the trustees of the university. See Act of July 7, 1972, P.L. 743, no. 176, as amended. Thus, Lincoln is subject to annual audits by the Department of the Auditor General. See Fiscal Code, 72 P.S. §403.

2. Dr. Sudarkasa did not claim that any member of the office of the Auditor General participated in the civil conspiracy.

3. Lincoln's annual state appropriation is constitutionally mandated to be passed by two-thirds of the members of each house of the Generally Assembly. Pennsylvania Constitution, Article III, Section 30.

funds was based upon a six-month audit finding that the competitive bidding requirements for projects in excess of $5,000 were "flagrantly ignored," and Lincoln officials permitted the expenditure of over $500,000 to renovate and restore the president's home without the prior approval of the board of trustees.

Dr. Sudarkasa further alleged that, in the year prior to her resignation, Glanton's efforts to remove her from the position of president of Lincoln included defaming her character by accusing her of "mismanagement" of Lincoln, management over "unauthorized expenditures" on the president's house, and the management over the actions of John Clark, the director of Lincoln's physical plant and Dr. Sudarkasa's husband, which included the creation of an "illegal landfill" and the burial of "hazardous waste" on the campus, and "alleged criminal activity." [4]

Dr. Sudarkasa additionally claimed that Glanton's efforts to remove her as president included the disclosure of her personal tax information to Lincoln officials in violation of Glanton and Reed Smith's duty of confidentiality and loyalty owed to her. Dr. Sudarkasa contended that during the course of her presidency, and Glanton's position as general counsel for Lincoln, Glanton represented her personally in two matters: (1) IRS audit of her regarding whether Lincoln's provisions to the president for housing should constitute taxable income to her personally, and (2) Dr. Sudarkasa's 1992 and 1996 employment contracts with Lincoln.

Dr. Sudarkasa submitted that the court erred in the following respects in granting the nonsuit: (1) by con-

---

4. Glanton contended that the "alleged criminal activity" publication was based upon a failure of Lincoln to use a competitive bidding procedure for procurement purposes, or "bid rigging."

sidering nonsuit where defendants had introduced evidence during Dr. Sudarkasa's case in chief; (2) by considering affirmative defenses, including the First Amendment of the United States Constitution and the *Noerr-Pennington* doctrine, during its evaluation of the motion for a compulsory nonsuit; (3) by concluding, as a matter of law, that the First Amendment and the *Noerr-Pennington* privilege precluded any common-law claims for defamation and tortious interference with a contract; (4) by concluding that the *Noerr-Pennington* privilege precluded Dr. Sudarkasa's claim for tortious interference with her employment contract; (5) by concluding that Dr. Sudarkasa was a limited-purpose public figure for the purpose of defamation; (6) by concluding that expert testimony was necessary to support Dr. Sudarkasa's claim for legal malpractice; (7) by concluding that Dr. Sudarkasa failed to establish her claim for civil conspiracy; (8) by granting the motion to quash subpoenas filed by Senator Vincent Fumo, Senator Hardy Williams, Gary Tuma, Frank Wallace and Elliott Roth; (9) by precluding Dr. Sudarkasa from asserting that the statements contained in the *Philadelphia Magazine* article were defamatory; and (10) by not ruling on the motion to quash subpoenas filed by newspaper reporters from *The Philadelphia Inquirer,* by Phillip Dixon and Rich Henson.

## II. STANDARD OF REVIEW

### *Motion for Nonsuit*

The standard for deciding whether to grant a nonsuit is well-established in this Commonwealth. A compulsory nonsuit is properly granted where a plaintiff has

"failed to establish a right to relief." Pa.R.C.P. §230.1. A nonsuit is proper "only if the fact-finder, viewing all of the evidence in favor of the plaintiff, could not reasonably conclude that the essential elements of a cause of action have been established . . . A compulsory nonsuit can only be granted in cases where it is clear that a cause of action has not been established and the plaintiff must be given the benefit of all favorable evidence along with all reasonable inferences of fact arising from that evidence, resolving any conflict in favor of the plaintiff." *Shannon v. McNulty*, 718 A.2d 828, 829 (Pa. Super. 1998). And this is how the court ruled.

## III. DEFAMATION

The court found that, as a matter of law, Dr. Sudarkasa was either a public official or a limited-purpose public figure within the contemplation of *New York Times v. Sullivan*, 376 U.S. 254 (1964), and thus, she had the burden of proving by clear and convincing evidence that Glanton acted with actual malice in publishing the alleged defamatory statements. Dr. Sudarkasa presented insufficient evidence that Glanton acted with actual malice when making the statements, and therefore, the cause of action for defamation was properly nonsuited.

### i. *Dr. Sudarkasa As a Public Official and/or Limited Purpose Public Figure*

The determination of whether a plaintiff is a private figure versus a public official or public figure is within the province of the court, and not of the jury. *New York Times*, 376 U.S. 254; *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974); *Byers v. Southeastern*

*Newspaper Corp.,* 161 Ga.App. 717, 288 SE.2d 698 (1982).

Lincoln was a state-aided university because it received approximately one-third of its $11 million funding annually from the Commonwealth of Pennsylvania. See Act of July 7, 1972, P.L. 743, no. 176, as amended. Lincoln's annual state appropriation is constitutionally mandated to be passed by two-thirds of the members of each house of the Generally Assembly. See Pennsylvania Constitution, Article III, Section 30. Dr. Sudarkasa held the position as president of one of the universities in the Commonwealth's system of higher education.

A person who has substantial responsibility for or control over conduct of governmental affairs, or who holds a position with such apparent importance that the public has an independent interest in the qualifications and performances of the person who holds it, beyond general public interest in the qualifications and performance of all governmental employees, may be considered a "public figure" or "public official" under the First Amendment for purposes of libel action. *Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 675 (1966); U.S.C. Const. Amend. I. The privilege is afforded to citizens only if those statements relate to the official duties of the public official in that capacity *Rosenblatt,* 383 U.S. at 75. Since public officials and public figures usually enjoy significantly greater access to the media, they have a better opportunity to deny the alleged defamatory statements than do private individuals. *Gertz,* 418 U.S. at 344.

Teachers, professors, and administrators holding positions of substantial responsibility in the public education system have been found to be public officials or

public figures under the *New York Times* rule. See *Byers,* 161 Ga.App. at 288 (holding that a dean of a state college was a limited-purpose public figure with respect to a controversy over the elimination of his position where he was publicly vocal about the controversy after the story broke); *Van Dyke v. Kutz,* 663 P.2d 52 (Utah 1983) (holding that the director of financial aid at a state college was a public official where he had considerable discretion to allocate federal student aid funds and his position invited public scrutiny); *Walko v. Kean College of N.J.,* 235 N.J. Super. 139, 561 A.2d 680 (1988) (holding that an assistant dean of the school of education and instructor was a limited-purpose public figure within the college community where she had been active in college life, her name was well-known to many in the college community, and she had previously submitted to a newspaper for publication information regarding her activities on and off campus).

As president of one of the Commonwealth's state-aided universities, and by virtue of this position, Dr. Sudarkasa was invested with a high level of decision-making authority over the spending of state funds, and the highest level with respect to this university. Lincoln's bylaws state that the president is the "executive officer of the board of trustees, the chief educational and administrative officer of the university. The president may specifically delegate such responsibility . . . to other officers of administration . . . but the president shall be accountable for implementation of any delegated assignments." Dr. Sudarkasa had considerable authority to determine the funding needs of Lincoln and allocate those funds. As president, she was the top administrative official at Lincoln. (N.T. 7/16/01, p. 97, ll. 14-15.) She exercised over-

sight of the budget for all campus activities. (N.T. 7/11/01, p. 23, ll. 13-14.) She also had the power to hire administrators in that Lincoln's bylaws stated that the president, subject to the approval of the board, "shall appoint the business and financial vice president."

The position as president of a state-aided university is so prominent that it invites public attention and comment. Just as the position of dean of the college in *Byers,* the position of president of a university is often called upon to make public speeches, formulate and implement policy decisions, and to interact with the citizenry of the surrounding community. *Byers,* 161 Ga.App. at 288. Dr. Sudarkasa, in fact, became well-known among Lincoln and the Philadelphia community in her capacity as president of Lincoln. Starting with the annual Auditor General reports issued in 1990, 1991, and 1992 criticizing Lincoln's bidding procedures,[5] the spending practices of Lincoln, and more specifically the president, were called into question. An article appeared on August 21, 1990, in the *Philadelphia Daily News,* a local, widely-circulated newspaper, entitled "Lincoln Official Felt Free to Shop but State Auditors Find he Spent 250G Without Authority." See exhibit DR-8.[6] The *Philadelphia Daily News* article reported that the Commonwealth's office of the Auditor General found that John Clark, director of the physical plant and Dr. Sudarkasa's husband, made $250,000 worth of "unauthorized" purchases with

---

5. Lincoln is subject to annual audits by the Department of the Auditor General since it receives funding annually from the Commonwealth of Pennsylvania. See Fiscal Code, 72 PS §403; see Act of July 7, 1972, P.L. 743, no. 176, as amended.

6. This article was published about seven years before Glanton made any statement that became the subject of this lawsuit.

Lincoln's money, including a Lincoln Continental for the president, and in some cases circumvented required competitive bidding procedures. Another article appeared in the *Philadelphia Inquirer* on September 7, 1997, regarding the grand physical condition of the president's house at Lincoln, entitled "Beautiful Homes in the Area."[7] During the time of the public controversy, Lincoln was also faced with student protests and allegations regarding housing and the lack of renovations of dorm rooms. (N.T. 7/16/01 a.m., p. 97, ll. 17-24; p. 98, ll. 13-21.) Flyers were distributed on campus at various times informing that a great deal of work was going on in the president's house. (N.T. 7/10/01, p. 162, ll. 1-15.) Some of the student dorm buildings were cited for licensing and inspection violations regarding fire codes and building codes. (N.T. 7/16/01 a.m., p. 100, ll. 13-23.) Another article appeared in the *Philadelphia Inquirer* on February 4, 1998, entitled "Renovation is probed at Lincoln University: Critics say renovation of the president's house was too lavish and did not follow procedure." See exhibit P-64.

Similarly, where a plaintiff thrusts herself into the public eye in an effort to respond to allegedly defamatory allegations, she becomes a public figure for the purpose of that controversy. *Chuy v. Philadelphia Eagles Football Club,* 431 F. Supp. 254, 267 (E.D. Pa. 1977). Indeed, Dr. Sudarkasa thrust herself in the public eye of the Philadelphia community regarding the expenditure of Lincoln's funds. She voluntarily participated in an interview and provided an "open house" for the *Phila-*

---

7. This article was published about three months before Glanton made any statement that became the subject of this lawsuit.

*delphia Inquirer,* a local, widely-distributed newspaper, for the purpose of the writing of an article entitled "Beautiful Homes in the Area," published on September 7, 1997. (N.T. 7/10/01, pp. 156-57.) This article appeared prior to any statement made by Glanton that became the subject of this lawsuit. The first time Glanton suggested that Lincoln expenditures were unauthorized was in a memorandum from Glanton to Dr. Sudarkasa and Kenneth Sadler (chairman of Lincoln's board of trustees) regarding the state senate's investigation of certain university expenditures on December 30, 1997. (N.T. 7/10/01, p. 194.) The article spoke of the house's furnishings, her and John Clark's vast African art collection, and how the house was used for the reception of dignitaries. (N.T. 7/10/01, p. 157.) Also, Dr. Sudarkasa issued a "news release" on September 15, 1998, in response to the Auditor General's report of September 9, 1998, in which she announced her resignation as president of Lincoln and acknowledged serious management deficiencies under her administration. (N.T. 7/11/01, pp. 75-76.)

As the top administrator of a state-aided university, the taxpayers and students had an interest in the job performance of the president. Here, all of the alleged defamatory statements related only to Dr. Sudarkasa's performance in her position as president of Lincoln. Dr. Sudarkasa invited public attention and comment regarding the spending of Lincoln money. Public attention and scrutiny did, in fact, occur. One who criticizes this conduct is entitled to the immunity provided by the First Amendment of the United States Constitution as delineated in *New York Times* and its progeny.

## ii. *Actual Malice*

Given that Dr. Sudarkasa was a public official or limited-purpose public figure, and the alleged defamatory statements related to her official conduct, she had the burden of proving actual malice. *New York Times,* 376 U.S. at 280. Actual malice must be proven by clear and convincing evidence. *New York Times,* 376 U.S. at 280; *Masson v. New Yorker Magazine Inc.,* 501 U.S. 496, 510, 111 S.Ct. 2419, 2429 (1991). Despite its name, actual malice is not bad motive or ill will, rather, it is knowledge of the statement's falsity or publication with reckless disregard of whether the statement is true or false. *New York Times,* 376 U.S. at 280. A showing of negligence is not enough. *New York Times,* 376 U.S. at 288. The standard is a subjective one in that there must be sufficient evidence to permit the conclusion that the defendant had a "high degree of awareness of . . . probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215.

The reason for the actual malice standard is that debate on public issues should be "uninhibited, robust, and wide-open." *New York Times,* 376 U.S. at 271. As *New York Times* explained:

"It is of the utmost consequence that people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great that they more than counterbalance the inconvenience of private persons whose conduct may be involved and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from

publicity is so great and the chance of injury to private character so small that such discussion must be privileged." *New York Times,* 376 U.S. at 281.

In the first instance, Dr. Sudarkasa failed to produce evidence in her case in chief that Glanton had knowledge of the statements' falsity, or that he had information of any sort indicative of the statements' falsity at the time of publication. It follows then that recklessness, a prerequisite for liability, is not even an issue in this case. Indeed, an examination of the record revealed that Dr. Sudarkasa proved in her case in chief a reasonable basis for all of the statements made by Glanton. The alleged defamatory statements included an accusation of "mismanagement" at Lincoln, "unauthorized expenditures" on the president's house, "alleged criminal activity," and management over the creation of an "illegal landfill" and the burial of "hazardous waste" on the campus.

In support of her burden of proof, Dr. Sudarkasa first pointed out that the Auditor General made no findings of unauthorized expenditures. She also pointed out that Lincoln's board of trustees had subsequently passed a resolution that the past expenditures on the president's house were authorized. (N.T. 7/11/01 a.m., pp. 64-74.) Second, she showed that the Auditor General made no findings of criminal activity. Third, Dr. Sudarkasa cited the finding by the United States Environmental Protection Agency that there were "no readings above average background levels," and that the area behind the maintenance location "posed no threat to human health or the environment."

That there was no finding by the Auditor General on certain subjects was of no moment to Dr. Sudarkasa's

burden of showing actual malice. The actual malice standard required Dr. Sudarkasa to prove clearly and convincingly that Glanton had information regarding the falsity of his statements at the time of publication that he recklessly disregarded. Dr. Sudarkasa presented no such evidence.

An examination of the evidence presented by Dr. Sudarkasa revealed the existence of information that would provide a reasonable basis for Glanton's statements. The transcript reads that the independent audit of the Department of the Auditor General found that Lincoln's bidding procedures were not always followed and were sometimes rigged. (N.T. 7/10/01, p. 30, ll. 14-15; p. 37, ll. 16-18.) Likewise, KPMG found several instances of noncompliance with Lincoln procurement policies and procedures in that purchase orders were not always issued, work was sometimes completed, and three competitive bids were not always obtained for expenditures greater than $5,000. (N.T. 7/11/01 a.m., p. 88, ll. 7-15.) Also, Glanton testified upon direct examination by Dr. Sudarkasa's attorney (as on cross) that there is an Administrative Code governing state-aided institutions that requires competitive bidding. (N.T. 7/16/02 p.m., pp. 58-60.) As to unauthorized expenditures, the Senate Appropriations Committee's investigation found that the spending was without authority, and its investigation was prompted by the *Philadelphia Inquirer* article of September 7, 1997, regarding spending on the president's house. (N.T. 7/11/01 a.m., p. 100.)

In sum, the court found that the evidence presented was constitutionally insufficient to sustain a judgment for Dr. Sudarkasa. The evidence did not show, clearly

and convincingly, that the information Glanton had at the time of the publications would have constituted a reckless disregard for the truth. The evidence taken together, viewed in a light most favorable to Dr. Sudarkasa, shows, at most, the opportunity for a difference of opinion and for fair comment. Such is insufficient to satisfy the burden of actual malice as a matter of law. It is evident that, at the least, Glanton's statements and opinions were reasonable ones, and there was no evidence to impeach his basis for holding them.

## IV. ASSERTION OF NEW CLAIM FOR DEFAMATION

Dr. Sudarkasa contended that the court erred in precluding her from asserting that a statement made by Glanton and published in an article in the *Philadelphia Magazine* entitled "With Friends Like These" in January of 1999 was defamatory.

On the seventh day of trial, during Dr. Sudarkasa's direct examination of Glanton, she asked whether he told a *Philadelphia Magazine* writer, who subsequently published an article saying so, that she was "two steps from a damn jail." (N.T. 7/16/01 p.m., p. 107.) Glanton answered in the affirmative. (N.T. 7/16/01 p.m., p. 107.) Glanton objected to a continuation of this line of inquiry because no statements attributed to Glanton by the *Philadelphia Magazine* were contained within the complaint. (N.T. 7/16/01 p.m., p. 115.) Glanton's objection was sustained.[8] Defendants then handed to the court a memorandum in opposition to new claim for defamation. In

---

8. Dr. Sudarkasa made no argument that the timing of Glanton's objection created an estoppel.

response, Dr. Sudarkasa requested to be permitted to assert that the statements contained in the *Philadelphia Magazine* article were defamatory.[9] The court denied that request.

In support of her request, Dr. Sudarkasa argued that the new statement was not a new cause of action but an amplification of the existing complaint, the *Philadelphia Magazine* article was listed on the exhibit list as early as March 6, 2001, defendants were provided a copy of the article six days before trial, and the introduction of it would not have been prejudicial because the complaint similarly alleged that Glanton accused Dr. Sudarkasa of involvement in "criminal activity." (See complaint ¶73, exhibit S.)

Defendants opposed the inclusion of the statement in the *Philadelphia Magazine* article in the defamation claim on the following grounds: (1) the statement was not contained within the complaint; (2) the statement had not been produced until seven days before trial; (3) Dr. Sudarkasa expressly limited her cause of action in discovery proceedings to the statements contained in the complaint and the response to defendants' motion for summary judgment; (4) amendment to the complaint was barred by the running of the statute of limitations; (5) admission of the statement would have been contrary to the order of January 18, 2001, stating that Dr. Sudarkasa was "precluded from presenting any claim not presently contained in the pleadings in this case"; and (6) an amendment to the complaint would be prejudicial to defendants.

---

9. Although Dr. Sudarkasa's motion was not filed with the court, and she does not cite to the record where the motion may be found, it was received by the court at time of trial and dated July 23, 2001. Therefore, the court will address the merits of the motion.

First, by order dated January 18, 2001, Dr. Sudarkasa was "precluded from presenting any claim not presently contained in the pleadings in this case." This was the law of the case. The statement from the *Philadelphia Magazine* article could not be considered an amplification of the existing complaint and would have constituted an entirely new cause of action, thus, an amendment would have been required but was prohibited by the January 18, 2001 order. The complaint contained neither the proffered statement nor a copy of the *Philadelphia Magazine* article containing the statement. The law requires that the actionable words which give rise to the defamation be stated with particularity in the complaint. *Gross v. United Engineers and Constructors Inc.,* 224 Pa. Super. 233, 235, 302 A.2d 370, 371 (1973). A complaint in defamation must stand or fall on its own accord. *Spain v. Vicente,* 315 Pa. Super. 135, 141, 461 A.2d 833, 836 (1983). Thus, since the statement did not appear in the complaint, a claim for defamation could not have been based upon it. Further, it cannot be said that the statement in the *Philadelphia Magazine* article was merely an amplification of the existing complaint. The *Philadelphia Magazine* statement was published to a different person than any alleged in the complaint and did not arise out of the same nucleus of operative facts. The proferred publication was separate and distinct from any in the complaint.

Second, since the amendment to include the *Philadelphia Magazine* publication constituted a new cause of action, it was barred by the running of the one-year statute of limitations. Assuming arguendo the January 18, 2001 order did not prohibit amendment, an amendment to add a new cause of action will not be permitted after

the tolling of the statute of limitations. *Romah v. Hygienic Sanitation Co.,* 705 A.2d 841 (Pa. Super. 1997). The *Philadelphia Magazine* article was published in January of 1999, that is four months after the complaint was filed and two and a half years before Dr. Sudarkasa moved to assert it as part of her defamation claim. The purpose of the statute of limitations is to expedite litigation and thus, discourage delay and the presentation of claims which may greatly prejudice the defense of such claims. *Insurance Company of North America v. Carnahan,* 446 Pa. 48, 51, 284 A.2d 728, 729 (1971). The statute of limitations is not only a "statute of repose, but [supplies] the place of evidence lost or impaired by lapse of time, by raising a presumption which renders proof unnecessary." *Schmucker v. Naugle,* 426 Pa. 203, 205, 231 A.2d 121, 123 (1967). The new publication did not arise out of the same set nucleus of facts and the witness to whom the statements were made was different than any of the witnesses of the publications in the complaint. Thus, denying the assertion of the new statement was in keeping with the purpose of the statute of limitations.

Likewise, Dr. Sudarkasa cannot be heard to say that the discovery rule applied to toll the statute of limitations. Plaintiffs are required to exercise due diligence to preserve their causes of action. *Pocono International Raceway v. Pocono Produce Inc.,* 503 Pa. 80, 86, 468 A.2d 468, 471 (1983). An exercise of due diligence would have apprised Dr. Sudarkasa within one year of publication since she was interviewed for the article. See *Philadelphia Magazine* article, pp. 81, 82, 133; see defendants' memorandum in opposition to new claim for defamation, p. 2. The article was based upon Dr. Sudarkasa's resignation, her recently-filed complaint, and the prior

relations between her and Glanton. The article includes Dr. Sudarkasa's responses to many of Glanton's statements regarding her resignation. See *Philadelphia Magazine* article, p. 81. Dr. Sudarkasa's husband, John Clark, was also interviewed for the article. See *Philadelphia Magazine* article, p. 132. Dr. Sudarkasa had based her complaint on newspaper articles, letters, and papers distributed within the Philadelphia area. The *Philadelphia Magazine* is a well-known source of information and gossip regarding Philadelphia's luminaries, be they famous or infamous. Dr. Sudarkasa had inspected the publications in the Philadelphia area and certainly, an exercise of even minimal diligence would have included an inspection of the *Philadelphia Magazine* article.

Third, Dr. Sudarkasa was precluded from including the *Philadelphia Magazine* statement in her claim for defamation because she limited her cause of action to statements contained within the complaint, depositions, and her response to defendants' summary judgment motion, and none contained the proferred statement. Dr. Sudarkasa limited her claim by stating in her deposition that all defamatory statements included in her cause of action had been identified in the complaint, depositions, and response to defendant's motion for summary judgment. Her deposition in which she limited her claim was taken on September 1, 2000. Since she was interviewed for the *Philadelphia Magazine* article and her deposition was taken one year and eight months after the publication of the article, she knew or should have known of the article's publication at the time of her deposition. The transcript of her deposition taken by defense counsel on September 1, 2000 reads in pertinent part as follows:

"Q: Can you tell me what those statements were that were false, misleading and defamatory [as alleged in paragraph 16 of the complaint]?

"Mr. Singley: I'm going to object and direct you to the exhibits attached to the complaint."

The transcript of the deposition of Dr. Sudarkasa on February 8, 2001 reads in part as follows:

"Mr. Sugarman: Mr. Singley, we reviewed the answers to the questions. I don't find any question which specifically addresses the allegation of paragraph 16 of the complaint that Mr. Glanton maliciously and intentionally made false and misleading and defamatory statements about Dr. Sudarkasa personally and her management of Lincoln.

"Mr. Singley: Okay.

"Mr. Sugarman: I do find the reference that you gave addresses the subject of what the defamatory—of what defamatory—certain defamatory, false and misleading statements in her view, and so I don't feel like I need to go back over what has been asked. I'm trying to find a way to make sure that I have covered the waterfront and that there aren't any others. I can do it in one of two ways: I can identify the ones that I found in those references and ask her if there are any others, or I can ask her to identify all of the statements that she is referring to in paragraph 16 of the complaint, and I want to be cooperative, so I will ask that. Let me try asking it one way and see if that is objectionable to you.

"Mr. Singley: Let me make a statement. I don't intend to let her answer any more questions from you with regard to what she considers to be defamatory, for a couple of reasons. Those questions have been asked at great

lengths in the previous deposition, pages of which are not a matter of record, and I have given you those page numbers. In addition, I call your attention to page 34 of our response to your motion for summary judgment. Therein you will find on pages 34 to 35, one, two, three, four, five, six, seven, eight, nine, ten references to what she considered to be defamatory. That is now a matter of the closed discovery record. So I don't intend to let her go beyond what she has testified to on several previous occasions and that was a part of our response to the motion for summary judgment, that specifies both documents as well as transcript testimony indicating what she considers defamatory. I'm going to instruct her not to answer any more questions with regard to the defamation claim. Now, if you wanted to ask—if you want to review these and see—and specifically to items at page 34 and ask whether there is something, other than what is found there, then you know, that is fair game.

"Mr. Sugarman: Alright. Well, that is—first of all, you are forcing me to accept your characterization instead of getting the testimony from the witness.

"Mr. Singley: It is a matter of record already. Both deposition transcripts and as well as documents that are now before—that will be before the court. . . .

"Mr. Sugarman: Dr. Sudarkasa, you have in front you the copy of your counsel's memorandum in response to our motion for summary judgment and your attention, I think, has been directed to pages 34 and 35 where there is a series of bullets, 10 bullets. Are those the defamatory, false or misleading statements that you believe which Mr. Glanton maliciously and intentionally made about you personally in your management of Lincoln as referred to in paragraph 16 of the complaint?

"A: That is the—he is—those are the major ones.

"Q: Are there any others that you are aware of?

"A: Yes, there are.

"Q: What are they?

"A: They are referred to in the documents that we provided . . . I will stand by those that have been identified in the previous deposition."

Here, Dr. Sudarkasa admitted there were other statements that she was aware of but expressly limited herself to those which the defendants were aware through court filings. Plaintiff was therefore estopped from asserting the statement in her claim for defamation at time of trial.

Lastly, even if the statue of limitations did not apply, amendments will not be permitted where surprise or prejudice would result to the opposing party. *Spain,* 315 Pa. Super. at 141, 461 A.2d at 838. The admission of the statement that Dr. Sudarkasa was "two steps from a jail" would have been prejudicial to Glanton since none of the statements identified in the complaint constituted an accusation of criminal activity by Glanton himself, but instead referred to "alleged criminal activity." See plaintiff's complaint, ¶73, exhibit S. There is a material difference in fact between "alleged" criminal activity and "criminal activity." A defense against the former would include evidence that a third party had accused Dr. Sudarkasa of criminal activity. A defense against the latter would include evidence that Dr. Sudarkasa committed any act prohibited by the Crimes Code. Since not all criminal activity results in a prison sentence, a defense against "two steps from a jail" would include evidence that Dr. Sudarkasa committed only that type of illegal

act which could result in a prison sentence. Thus, the new statement was materially different than those pled and Glanton would have had inadequate time to prepare a defense.

## V. BREACH OF DUTY OF CONFIDENTIALITY AND LOYALTY

Dr. Sudarkasa argued that the court erred in finding that expert testimony was required to meet her burden of proof as to defendants' alleged breach of duty of confidentiality and loyalty. This court disagreed.

Dr. Sudarkasa alleged that Glanton and Reed Smith committed legal malpractice by breaching their duty of loyalty and confidentiality in disclosing to third persons that Dr. Sudarkasa had a history of "non-filing" of her tax returns. Those third persons included Eugene Cliett (vice president of fiscal affairs at Lincoln), Kenneth Sadler (chairman of the board of trustees at Lincoln), and members of the Business Affairs Committee.[10]

Dr. Sudarkasa provided information regarding her taxes to Glanton pursuant to her representation in an IRS audit that questioned whether the non-salary compensation she received from Lincoln should constitute taxable income to her. Upon receipt of the IRS audit, Dr. Sudarkasa requested that Lincoln pay for legal representation for the audit since it related to benefits that she

---

10. Dr. Sudarkasa argued in her motion for post-trial relief that the "non-filing" was also disclosed to Kevin Collins, staff member of the Department of Auditor General. In support of this, she cited to plaintiff's exhibit 100 in which Glanton carbon copied Kevin Collins on a letter. Dr. Sudarkasa provided no record citation to the reading of this exhibit to the jury or the admittance of this exhibit at trial.

received under her employment contract.[11] Per Dr. Sudarkasa's request, Lincoln's Business Affairs Committee agreed to pay up to $10,000 for that representation. (N T. 7/11/01, p. 13.) As part of the representation for the audit, Dr. Sudarkasa provided to Glanton, information that she had previously filed her tax returns late.

Dr. Sudarkasa took the position that Glanton owed her a duty of confidentiality and loyalty since he represented her personally in both the employment renewal contracts and the IRS audit.

As to the employment renewal contracts, Dr. Sudarkasa contended that Glanton simultaneously represented Lincoln and her personally. We concluded that there was insufficient evidence to support a finding of a personal representation as to the employment renewal contracts. There was no evidence of a written contract, and scant evidence of an oral one. Dr. Sudarkasa knew that Glanton held the position of general counsel to Lincoln. Dr. Sudarkasa did not pay for any representation she ostensibly received from Glanton. The only evidence presented of a personal representation as to the employment renewal contracts was Dr. Sudarkasa's subjective belief that Glanton was "seeing to it" that her "interests were represented in a contract." (N.T. 7/8/01 a.m., pp. 8-9.) A client's belief of representation cannot be subjective, but must be reasonable. *Cost v. Cost,* 450 Pa. Super. 685, 693, 677 A.2d 1250, 1254 (1996). Dr. Sudarkasa's subjective belief of the existence of such a relationship was not reasonable and thus, was insufficient to support her cause of action, particularly in the absence of any evi-

11. Specifically, under the employment contract, Dr. Sudarkasa was required to reside in the president's house on Lincoln's campus. The IRS suggested taxing Dr. Sudarkasa for the receipt of this benefit.

dence of an agreement between the parties or conduct of the defendant which would lead a reasonable person to believe she was receiving representation personal to her.

As to the representation on the IRS audit, Dr. Sudarkasa alleged that Glanton represented her personally. We concluded that the evidence was insufficient to support such a finding. At all times, Glanton's ostensible representation related directly to the affairs of Lincoln, and compensation for that representation was paid for by Lincoln. Indeed, the basis for Dr. Sudarkasa's request for representation (and the Business Affairs Committee approval) was Lincoln's requirement that the president live in the president's house. Thus, no reasonable jury could conclude that Dr. Sudarkasa reasonably believed that she was receiving representation personal to her.

Likewise, there was insufficient evidence that any representation by Glanton was exclusive to her and did not also include representation of Lincoln. Dr. Sudarkasa knew or should have known that since Lincoln was paying for the legal costs associated with both proceedings, it believed it had an interest in both. As president of Lincoln, Dr. Sudarkasa should have known that Lincoln's expenditure of university money must be for appropriate purposes. Further, Dr. Sudarkasa presented no evidence on the duty owed to a client where the representation is joint, rather than exclusive. Expert testimony is generally required in legal malpractice cases unless the issue is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of the ordinary layperson. *Storm v. Golden,* 371 Pa. Super. 368, 375, 538 A.2d 61, 64 (1988). Expert testimony is required where the al-

leged breach of duty is complex such that it necessitates the aid of an expert. *Storm,* 371 Pa. Super. at 376, 538 A.2d at 65. The nature and extent of any duty owed to Dr. Sudarkasa in this representation could not be expected to be known by a layperson. Dr. Sudarkasa presented no evidence of a breach where Glanton revealed Dr. Sudarkasa's "non-filing" only to the Business Affairs Committee of Lincoln and members of Lincoln's board, and defendant was undisputably at all times general counsel for Lincoln. Neither did Dr. Sudarkasa present evidence of a duty owed by corporate counsel to an employee.

Further, a claim for legal malpractice requires proof of both causation and harm. *Kituskie v. Corbman,* 552 Pa. 275, 281, 714 A.2d 1027, 1030 (1998). A breach of a fiduciary duty is evidence to support the legal malpractice cause of action but is not dispositive of it. The alleged forced resignation of Dr. Sudarkasa was expressly caused by the findings of the Department of the Auditor General and the Senate Appropriations Committee, as outlined in their reports. Neither report based their findings on Dr. Sudarkasa's "non-filing." Thus, the disclosure of "non-filing," taken as true, cannot be said to have caused Dr. Sudarkasa's resignation.

## VI. TORTIOUS INTERFERENCE WITH A CONTRACT

Dr. Sudarkasa took the position that the court erred in granting nonsuit as to tortious interference with a contract because the court should not have considered the *Noerr-Pennington* doctrine, and even if the doctrine applied, Glanton's petitioning was not genuine and was a sham. The court disagreed.

The cause of action for tortious interference with contractual relations requires the plaintiff to prove the following four elements: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant, and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Hess v. Gebhard & Co. Inc.,* 769 A.2d 1186, 1194 (Pa. Super. 2001). Included in these elements is the plaintiff's burden to prove the absence of privilege or justification on the part of defendant. *Vintage Homes Inc. v. Levin,* 382 Pa. Super. 146, 154, 554 A.2d 989, 993 (1989). Although privileges are usually treated as affirmative defenses, the cause of action of tortious interference with a contract requires plaintiffs to plead and prove that defendants' actions were not privileged. *Vintage Homes Inc.,* 382 Pa. Super. at 155, 554 A.2d at 994.

Dr. Sudarkasa's evidence in support of this cause of action included Glanton's writing of letters to the chairman of the Senate Appropriations Committee, the Auditor General, and the Lincoln board of trustees regarding her expenditure of Lincoln funds as well as Glanton's alleged disclosure of confidential client information in those letters,[12] and also Glanton's alleged defamatory statements that Lincoln took bids illegally and disposed of hazardous waste on the campus.

---

12. The alleged "disclosure" was Glanton's statement that Dr. Sudarkasa had not timely filed past tax returns. For a discussion on this, see section above entitled "Breach of duty of confidentiality and loyalty."

Actions giving rise to the interference with contractual relations are not improper where they "foster a social interest of greater public import than is the social interest invaded." *Brownsville Golden Age Nursing Home v. Wells,* 839 F.2d 155, 159 (3d Cir. 1988) (granting defendant's summary judgment motion and holding that defendants, senator and private citizens, could not be held tortiously liable for attempting to bring nursing homes' noncompliance with state regulations and laws to the attention of appropriate authorities). Of great social interest is the exercise of the First Amendment right to petition the government. *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 137, 81 S.Ct. 523 (1961); *Brownsville,* 839 F.2d at 159. The government's power to act in a representative capacity to the people requires the ability of the people to freely lodge their objections with the government. *Eastern Railroad Presidents Conference v. Noerr,* 365 U.S. at 137. Specifically, citizens are protected from notifying appropriate agencies or mobilizing public opinion about serious violations of the law. *Brownsville,* 839 F.2d at 159. The inappropriate expenditure of state money could reasonably constitute a serious violation of the law. Glanton's letters and statements advising pertinent individuals and agencies regarding this possible serious violation is protected under the *Noerr-Pennington* doctrine, and such protection is in keeping with the purpose of the doctrine.

The *Noerr-Pennington* doctrine will not afford immunity to those using the petitioning process as a means of interference or harassment; rather, the private action must be genuinely aimed at procuring favorable government action. *The Barnes Foundation,* 927 F. Supp. 874, 877

(E.D. Pa. 1996) (granting defendants' preliminary objections to dismiss them from the action and finding that the *Noerr-Pennington* doctrine immunized the citizens' actions in petitioning their government). Frivolous petitioning is a "sham" and will not be afforded the *Noerr-Pennington* immunity. *The Barnes Foundation,* 927 F. Supp. at 877. As long as there is petitioning activity, the motive of the petitioner is irrelevant. *The Barnes Foundation,* 927 F. Supp. at 877.

Thus, it is clear that the freedom to engage in public debate and induce legislative action cannot be chilled by subsequent litigation brought against the petitioning citizen for an injury occurring as a result of the petitioning itself, so long as the action has a reasonable chance of procuring favorable government action. Glanton's actions cannot be said to have been frivolous inasmuch as they were ultimately successful in procuring favorable government action. The findings by the Commonwealth's Auditor General and the Senate Appropriations Committee, taken together with Dr. Sudarkasa's replacement, provide a presumption of propriety of Glanton's actions.

## VII. CIVIL CONSPIRACY

Dr. Sudarkasa argued that the court erred in granting a nonsuit as to the civil conspiracy cause of action because there was enough circumstantial evidence to support the required elements.

Civil conspiracy must be proven by clear and convincing evidence that defendant and other co-conspirators engaged in an unlawful act (or a lawful act by unlawful means). *Smith v. Wagner,* 403 Pa. Super. 316, 322-23, 588 A.2d 1308, 1311-12 (1991). Dr. Sudarkasa contended

that the unlawful act was the interference with her employment contract with Lincoln by forcing her to resign from her position as president. As discussed above, the exercise of one's First Amendment right to petition the government is of great social interest and is not unlawful. *Brownsville,* 839 F.2d at 159. Specifically, citizens are protected from notifying appropriate agencies or mobilizing public opinion about serious violations of the law. *Brownsville,* 839 F.2d at 159. Any damage to the scrutinized person's employment contract as a result of such action must be viewed as an incidental effect, and not a tort. Thus, Glanton's statements and/or disclosures cannot form the basis of an interference with contractual relations action.

## VIII. DR. SUDARKASA'S TRIAL SUBPOENA OF MEMBERS OF THE LEGISLATIVE BRANCH

Dr. Sudarkasa argued that the court erred in granting the motion to quash subpoenas filed by Senator Vincent Fumo, former senator and member of the Senate Appropriations Committee, Hardy Williams, communications director of the Senate Democratic Appropriations Committee, Gary Tuma, investigator retained by the Senate Appropriations Committee, Frank Wallace, and accountant retained by the Senate Appropriations Committee to investigate Lincoln, Elliott Roth.

Dr. Sudarkasa's subpoenas sought an appearance at trial, and the production of "all documents, including correspondence, interview notes, internal memoranda, external memoranda, electronic messages, and documents received from or exchanged with Richard Glanton, Esquire, or Reed, Smith, Shaw & McClay, [or Senator Fumo and his staff, for Wallace] by you or a member of

your staff regarding Lincoln University, The Barnes Foundation, Dr. Niara Sudarkasa, or John L. Clark."

The coordinate jurisdiction rule required the court to deny the motion to quash as to Senators Fumo and Williams only. Prior to the filing of the instant trial subpoena, Dr. Sudarkasa filed a deposition subpoena during the pretrial discovery period as to Senators Fumo and Williams only. Senators Fumo and Williams filed a motion to quash the trial subpoena arguing: (1) privilege pursuant to the Pennsylvania Constitution, Article II, Section 15 (speech and debate), (2) violation of separation of powers by injection of judicial inquiry into the legislative branch, (3) privilege pursuant to attorney-client, and (4) unreasonable investigation by a member of the Pennsylvania Senate. On October 2, 2000, the Honorable Arnold L. New granted the motion to quash. Dr. Sudarkasa subsequently filed the subject trial subpoenas as to Fumo, Williams, Tuma, Wallace, and accountant Roth.

The coordinate jurisdiction rule prohibits judges from reviewing previous rulings by judges. *Commonwealth v. Starr,* 541 Pa. 564, 573, 664 A.2d 1326, 1331 (1995). Since Judge New had previously ruled on the issue of whether Senators Fumo and Williams could be brought to speak in this case, and Dr. Sudarkasa articulated no different purpose for the testimony of these witnesses, this court was bound by the prior ruling. Dr. Sudarkasa argued that the coordinate jurisdiction rule did not apply because the trial subpoena was filed in a different procedural context than the deposition subpoena[13] and the

13. The deposition subpoena was filed prior to trial, during the discovery period. The trial subpoena subject to this appeal was filed shortly before trial for the purpose of summoning individuals to trial.

motion to quash was unopposed by her during discovery. The subsequently filed trial subpoena did not escape the coordinate jurisdiction rule simply because one was filed later than the other. Both subpoenas sought to bring two legislative members to the court to speak regarding their involvement in the legislative process. It is of no moment that one forum for the elicitation of legislative speech was in a deposition and another was at trial. Testimony given in both proceedings is under oath and would have required members of the legislature to be removed from their legislative sphere and subjected to questioning regarding their official duties. Further, Dr. Sudarkasa offered no reason for the propriety of the elicitation of the legislators' testimony at time of trial as opposed to the time of discovery.

Further, the speech and debate clause of the Pennsylvania Constitution afforded immunity to legislative members, Fumo, Williams, and Tuma since the testimony sought to be elicited by Dr. Sudarkasa was based upon prior conduction of official duties, specifically, the investigation of Lincoln. Article II, Section 15 of the Pennsylvania Constitution provides that members of the General Assembly shall not be questioned in any other place for any speech or debate in either house. See Pennsylvania Constitution, Article II, Section 15. The "speech and debate" clause has been broadly interpreted to prohibit inquiry into those things "generally said or done in house or senate in the performance of official duties and into motivation for those acts." *Pennsylvania State Lodge v. Commonwealth, Department of Labor and Industry,* 692 A.2d 609, 614 (Pa. Commw. 1997). Legislative immunity insures that legislators are free to represent the in-

terests of the public without fear that they will be later called to courts for that representation. *Common Cause/ Pennsylvania v. Commonwealth,* 710 A.2d 108, 118 (Pa. Commw. 1998). Dr. Sudarkasa stated no intention to elicit testimony based upon anything other than that regarding "Lincoln University, The Barnes Foundation, Dr. Niara Sudarkasa, or John Clark." Thus, all of the information sought to be elicited from the subpoenaed members was based upon the investigation of Lincoln which was undisputedly pursuant to their legislative authority under the Pennsylvania Constitution. Likewise, the exchange of any information and communication pursuant to the investigation was within the legitimate legislative sphere of the investigation. Regarding the subpoena of evidence as to The Barnes Foundation specifically, Dr. Sudarkasa stated that it was to be offered for the purpose of showing that Senator Fumo's law firm was retained by The Barnes Foundation. Fumo's law firm's work for The Barnes Foundation would not have supported any of the causes of action brought by Dr. Sudarkasa, as discussed in previous sections of this opinion. The testimony would have served only to show the motivation for the legislative acts. Motivation for legislative acts is protected by the speech and debate clause and was irrelevant to this case.

Moreover, the facts sought to be elicited from the legislative members, as stated by Dr. Sudarkasa, were undisputed at trial. Thus, the evidence from the legislative members would have been cumulative. The burden of subjecting legislative members to speak regarding their official actions and information obtained is much greater than the cost of admitting into evidence facts that are undisputed.

The court properly granted the motion to quash the trial subpoena as to Elliot Roth, accountant hired by the Senate Appropriations Committee to investigate Lincoln. Dr. Sudarkasa stated that the information sought to be elicited from Roth was regarding the findings within the final reports of the investigations. The findings by the Senate Appropriations Committee were undisputed. Thus, any additional evidence of such findings would have been cumulative.

## IX. DR. SUDARKASA'S TRIAL SUBPOENA OF MEMBERS OF THE PRESS

Dr. Sudarkasa argued that the court erred in "refusing to rule on" the motion to quash the trial subpoena filed by Phillip Dixon and Rich Henson of *The Philadelphia Inquirer*. Subpoenas continue to have full force and effect under the law unless and until a motion to quash is granted. Dr. Sudarkasa did not seek to compel the witnesses to testify at time of trial.

## X. EVIDENCE OF DEFENDANTS' DEFENSE DURING DR. SUDARKASA'S CASE IN CHIEF

Dr. Sudarkasa argued that defendants produced evidence during cross-examination of their defenses, and therefore, they waived their right to a nonsuit. Specifically, Dr. Sudarkasa points to the defendants' introduction of 30 exhibits during cross-examination and Glanton's responses going beyond the scope of the questions posed to him.

Defendants must move exhibits into evidence and the court must consider those exhibits in order for nonsuit to be improper *Holidaysburg Area School District Tax Col-*

*lectors v. Holidaysburg Area School District,* 660 A.2d 245, 247 (Pa. Commw. 1995) (holding that nonsuit was proper although evidence had been introduced on behalf of defendant where the exhibit in question was marked for identification only, was never offered into evidence, and was not considered by the court in its decision to enter nonsuit, and the subject matter of the exhibit was material and relevant to the issues, and thus was proper subject for cross-examination). A review of the transcript revealed that defendants never moved any exhibits into evidence. Likewise, this court's decision rested on Dr. Sudarkasa's case alone, without consideration of defense exhibits.

Parties to an action may offer themselves as witnesses and may be cross-examined freely, thus, the scope of cross-examination may exceed the scope of the direct where the witness is a party. *Holidaysburg,* 660 A.2d at 247. Glanton's offering of any information that can be said to support a defense did not preclude the court from entering a nonsuit.

Second, a review of the transcript revealed that the defense exhibits identified and cross-examination were limited to refuting that which was attempted to be proven on direct examination. In light of the elements required to prove Dr. Sudarkasa's causes of action, there was an overlap between evidence tending to disprove that which Dr. Sudarkasa attempted to proffer and evidence tending to prove a defense. The court found no evidence produced during cross-examination that could not serve the former purpose. Thus, defendants did not waive their right to move for compulsory nonsuit.

## XI. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

This cause of action was dismissed at the summary judgment stage on January 25, 2001, pursuant to another judge's order. Therefore, this judge will not be issuing an opinion on the dismissal of this cause of action.

## XII. CONCLUSION

The trial court did not commit error in granting the motion for involuntary nonsuit and its decision should be affirmed.